# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### HAMMOND DIVISION

JOSE ANTONIO TORRES,       )
         Plaintiff,       )
                       )
      v.               )     CAUSE NO.: 2:13-CV-125-PRC
                       )
CAROLYN W. COLVIN,        )
Acting Commissioner of the    )
Social Security Administration,   )
         Defendant.     )

## OPINION AND ORDER

This matter is before the Court on a Complaint [DE 1], filed by Plaintiff Jose Antonio Torres on April 12, 2013, and a Plaintiff's Brief in Support of His Motion to Reverse the Decision of the Commissioner of Social Security [DE 16], filed by Plaintiff on September 26, 2013. Plaintiff requests that the November 21, 2011 decision of the Administrative Law Judge denying his claims for disability insurance benefits ("DIB") and supplemental security income ("SSI") be reversed and remanded for further proceedings. On January 9, 2014, the Commissioner filed a response, and Plaintiff filed a reply on January 22, 2014. For the following reasons, the Court grants Plaintiff's request for remand.

## PROCEDURAL BACKGROUND

Plaintiff suffers from paranoid schizophrenia and diabetes. On January 26, 2009, Plaintiff filed applications for DIB and SSI, alleging an onset date of October 25, 2008, based on schizophrenia and depression. The applications were denied initially on May 29, 2009, and upon reconsideration on September 1, 2009. Plaintiff timely requested a hearing, which was held on October 25, 2010, before Administrative Law Judge ("ALJ") Marlene R. Abrams. In appearance were Plaintiff, his attorney Thomas J. Scully III, impartial medical expert Kathleen M. O'Brien,

Psy.D., and vocational expert Cheryl R. Hoiseth. The ALJ issued a written decision denying benefits

on November 21, 2011, making the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2012.

2.    The claimant has not engaged in substantial gainful activity since October 25, 2008, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3.    The claimant has the following severe impairments: paranoid schizophrenia; substance abuse; and substance induced psychosis (20 CFR 404.1520(c) and 416.920(c)).

4.    The claimant's impairments, including the substance use disorder, meet Section 12.03 of 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

5.    If the claimant stopped the substance use, the remaining limitations would cause more than a minimal impact on the claimant's ability to perform basic work activities; therefore, the claimant would continue to have a severe impairment or combination of impairments.

6.    If the claimant stopped the substance use, the claimant would not have an impairment or combination of impairments that meets or medically equals any of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).

7.    If the claimant stopped the substance use, the claimant would have the residual functional capacity to perform work at all exertional levels handling simple, routine tasks.

8.    If the claimant stopped the substance use, the claimant would be able to perform his past relevant work (20 CFR 404.1565 and 416.965).

9.    The claimant was born in 1962 and was 48 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 4165.963).

10.    The claimant has at least a high school education or equivalent, and is able to communicate in English.

11. Transferability of job skills is not an issue because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

12. The substance use disorder is a contributing factor material to the determination of disability because the claimant would not be disabled if he stopped the substance use (20 CFR 404.1520(g), 404.1535, 416.920(g) and 416.935). Because the substance use disorder is a contributing factor material to the determination of disability, the claimant has not been disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of this decision.

(AR 10-22).

On February 21, 2013, the Appeals Council denied Plaintiff's request for review, leaving the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481. On April 12, 2013, Plaintiff filed this civil action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the Agency's decision.

The parties filed forms of consent to have this case assigned to a United States Magistrate Judge to conduct all further proceedings and to order the entry of a final judgment in this case. Therefore, this Court has jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c) and 42 U.S.C. § 405(g).

## STANDARD OF REVIEW

The Social Security Act authorizes judicial review of the final decision of the agency and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse only if the findings are not supported by substantial evidence or if the ALJ has applied an erroneous legal standard. *See Briscoe v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (quoting *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003)).

A court reviews the entire administrative record but does not reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ. *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000); *Butera v. Apfel*, 173 F.3d 1049, 1055 (7th Cir. 1999). Thus, the question upon judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is not whether the claimant is, in fact, disabled, but whether the ALJ "uses the correct legal standards and the decision is supported by substantial evidence." *Roddy v. Astrue,* 705 F.3d 631, 636 (7th Cir. 2013) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010); *Prochaska v. Barnhart*, 454 F.3d 731, 734-35 (7th Cir. 2006); *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004)). "[I]f the Commissioner commits an error of law," the Court may reverse the decision "without regard to the volume of evidence in support of the factual findings." *White v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

At a minimum, an ALJ must articulate her analysis of the evidence in order to allow the reviewing court to trace the path of her reasoning and to be assured that the ALJ considered the important evidence. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995). An ALJ must "'build an accurate and logical bridge from the evidence to [the] conclusion' so that, as a reviewing court, we may assess the validity of the agency's final decision and afford [a claimant] meaningful review." *Giles v. Astrue*, 483 F.3d 483, 487 (7th Cir. 2007) (quoting *Scott*, 297 F.3d at 595)); *see*

*also O'Connor-Spinner*, 627 F.3d at 618 ("An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and [the ALJ's] conclusions."); *Zurawski v. Halter*, 245 F.3d 881, 889 (7th Cir. 2001) ("[T]he ALJ's analysis must provide some glimpse into the reasoning behind [the] decision to deny benefits.").

### DISABILITY STANDARD

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations. The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing his previous work, but considering his age, education, and work experience, it must also prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f).

When a claimant alleges a disability, Social Security regulations provide a five-step inquiry to evaluate whether the claimant is entitled to benefits. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The steps are: (1) Is the claimant engaged in substantial gainful activity? If yes, the claimant is not disabled, and the claim is denied; if no, the inquiry proceeds to step two; (2) Does the claimant have an impairment or combination of impairments that are severe? If not, the claimant is not disabled, and the claim is denied; if yes, the inquiry proceeds to step three; (3) Do(es) the impairment(s) meet or equal a listed impairment in the appendix to the regulations? If yes, the claimant is automatically

considered disabled; if not, then the inquiry proceeds to step four; (4) Can the claimant do the claimant's past relevant work? If yes, the claimant is not disabled, and the claim is denied; if no, then the inquiry proceeds to step five; (5) Can the claimant perform other work given the claimant's RFC, age, education, and experience? If yes, then the claimant is not disabled, and the claim is denied; if no, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); *see also Scheck v. Barnhart*, 357 F.3d 697, 699-700 (7th Cir. 2004).

At steps four and five, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). The RFC "is an administrative assessment of what work-related activities an individual can perform despite [the individual's] limitations." *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001). The RFC should be based on evidence in the record. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008) (citing 20 C.F.R. § 404.1545(a)(3)). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Zurawski*, 245 F.3d at 886; *see also Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## FACTUAL BACKGROUND

### A. Medical History

*1.    Treatment History*

Plaintiff was born in 1962 and was 49 years old on the date of the ALJ's decision.

In 2008, treating psychiatrist Dr. Mohammed Arshad, M.D., diagnosed Mr. Torres with paranoid schizophrenia.

On a February 26, 2009 intake evaluation form, completed by staff of Miller Beach Terrace, an assisted-living facility where Mr. Torres periodically resided, the evaluator noted that Plaintiff's mood was often calm and his affect was congruent with his mood but that he appeared anxious and

demonstrated mild psychomotor agitation. Plaintiff was guarded when discussing the history of his mental illness. Mental health personnel confirmed a diagnosis of paranoid schizophrenia and determined that Mr. Torres' then-current Global Assessment of Functioning (GAF) score was between 41 and 50 and that he had a prior score between 31 and 41.

Plaintiff reported to the evaluator that he had abstained from alcohol use for the prior five years. However, it was noted that reports from previous providers and nursing staff at Miller Beach Terrace are that Plaintiff continued to abuse alcohol. When asked about this, Plaintiff responded, "I do still drink to numb the pain of my choices and to not think about how much I have disappointed my family." (AR 392). The evaluator wrote: "Client admitted that his mental illness prevents him from holding onto a job long enough to become independent. However, when queried about whether or not his long and continued history of substance abuse could also be a cause of him not being able to maintain employment client became evasive and minimized his usage." (AR 394). Plaintiff reported that he heard voices daily and was having difficulty maintaining employment. The evaluator noted that reports from medical providers showed that Plaintiff had a diagnosis of drug induced psychosis and substance abuse in 2005. No records could be located prior to 2005.

In March 2009, treating psychiatrist Dr. Hisham Sadek, M.D., prescribed Trazodone, Fluphenazine, Prolixin Decanoate, and Cogentin to treat Mr. Torres' paranoid schizophrenia.

On March 23, 2009, Plaintiff was admitted to Miller Beach Terrace, and Dr. Adolph Yaniz prescribed medication.

On May 29, 2009, an individual from the state agency contacted Peggy at Miller Beach Terrace. Peggy reported that Plaintiff was discharged for illegal activities, namely that he "robbed" a Coca-Cola truck that was delivering drinks to the facility. Peggy stated that Plaintiff had abused

drugs and alcohol while there, and that Plaintiff had behavior problems. Peggy reported that Plaintiff could perform activities of daily living without difficulty. Plaintiff would see the psychologist but would not attend group therapy sessions and was resistant to treatment. (AR 203).

Treatment records from Dr. Mohammad Arshad, a psychiatrist, at Miller Beach Terrace are dated July 28, 2009. The notes are illegible.

Additional treatment notes from Dr. Yaniz at Miller Beach Terrace show an admission date of August 13, 2009, with additional medication notations in December 2009. (AR 326).

Additional treatment notes from Miller Beach Terrace for psychiatry are dated August 18, 2009, and September 22, 2009. They are largely illegible. There are eight additional psychiatry progress notes from Miller Beach Terrace from January through August 2010. Although they are illegible, it appears that they are from Dr. Sadek. (AR 399-403).

The treatment record from Dr. Yaniz at Miller Beach Terrace shows an order dated March 5, 2010, for a monthly blood test for his diabetes. On August 7, 2010, Dr. Yaniz entered medication orders for Plaintiff at Miller Beach Terrace. Plaintiff's diabetes is controlled with medication.

On November 11, 2011, counsel for Plaintiff wrote to the ALJ and represented that Plaintiff was still living at Miller Beach Terrace. (AR 413).

2.    *Opinion Evidence*

    a.    Dr. Walters, consultative evaluator

On May 10, 2009, consultative psychologist Irena Walters, Psy.D., evaluated Mr. Torres. Dr. Walters diagnosed chronic paranoid schizophrenia. Plaintiff reported to Dr. Walters that he was previously living at the Miller Beach Terrace since 2005 and that he was evicted because of an altercation with a staff member. Dr. Walters noted that Plaintiff had been seeing Dr. Arshad at Miller

Beach Terrace. Plaintiff reported that he began hearing voices over twenty years earlier but that they had gotten worse in the previous year. Plaintiff also reported that he "sees spirits, but they go by real fast and I can't grab them," and that this occurs four to five times a day. (AR 299). Dr. Walters found no gross anxiety symptoms other than his great concern over getting his medications. Plaintiff's mood/affect were somewhat anxious. Dr. Walters found Plaintiff's fund of information to be "fair." (AR 299). Plaintiff admitted to Dr. Walters that he is not able to manage his own funds.

      b.      Dr. Pressner, consultative reviewer

On May 29, 2009, Joseph A. Pressner, Ph.D., submitted a Psychiatric Review Technique Form on which he found Plaintiff's medically determinable impairment to be chronic paranoid schizophrenia. In rating Plaintiff's functional limitations, Dr. Pressner found that Plaintiff had a mild degree of limitation in restriction of activities of daily living but a moderate degree of limitation in difficulties in maintaining social functioning and in difficulties in maintaining concentration, persistence, or pace. Dr. Pressner found no episodes of decompensation. (AR 311).

On the Mental Residual Functional Capacity Assessment that Dr. Pressner filled out that same day, in the section for limitations in "sustained concentration and persistence," Dr. Pressner checked that Plaintiff was moderately limited in his ability to work in coordination with or proximity to others without being distracted by them. He found that Plaintiff was not significantly limited in the categories of the ability to carry out very short and simple instructions, the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to sustain an ordinary routine without special supervision, the ability to make simple work-related decisions, or the ability to complete a normal workday and workweek without interruptions

from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (AR 315-16).

In the section for "social interaction," Dr. Pressner found that Plaintiff was moderately limited in the ability to interact appropriately with the general pubic, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 316).

In the narrative section, Dr. Pressner noted that Plaintiff's son stated that Plaintiff does fine with simple instructions and that he can pay attention for 1-1/2 to 2 hours at a time. Dr. Pressner believed that Plaintiff's problems were from illegal activities rather than a mental disorder. Dr. Pressner does not mention substance abuse. Dr. Pressner concluded that Plaintiff "is capable of performing [simple, routine tasks] on a sustained basis without special considerations." (AR 317).

c.      Dr. Sadek, treating psychiatrist

On November 3, 2010, Dr. Sadek submitted a Mental Evaluation Questionnaire on behalf of Plaintiff, in which he stated that Plaintiff's chronic mental illness was being treated through medication management and that his prognosis was guarded. At the time of completing the evaluation, Mr. Torres' GAF score was 45. Dr. Sadek checked the boxes for the following signs and symptoms: appetite disturbance with weight change, feelings of guilt or worthlessness, generalized persistent anxiety, recurrent and intrusive recollections of a traumatic experience that caused marked distress, changes in personality, seclusiveness, periods of both manic and depressive symptoms, perceptual or thinking disturbances, flight of ideas, illogical thinking, pressures of speech, unrealistic interpretations of physical signs or sensations associated with the preoccupation that one suffers

from physical illness, and a loss of intellectual ability of 15 IQ points or more. Dr. Sadek did *not* check the box for "substance dependence." (AR 409).

On the same form, on the chart of "Mental Abilities and Aptitudes Needed to Do Unskilled Work," Dr. Sadek checked the boxes indicating that Plaintiff's mental impairment caused him to be unable to meet competitive standards with regard to maintaining regular attendance and being punctual within customary, usually strict tolerances; sustaining an ordinary routine without special supervision; performing at a consistent pace without an unusual number and length of rest periods; accepting instructions and responding appropriately to criticism from supervisors; responding appropriately to changes in the work routine; and using public transportation.

Dr. Sadek checked boxes indicating that Plaintiff was seriously limited with regard to remembering work-like procedures; understanding, remembering, and carrying out very short and simple instructions; maintaining attention for a two-hour segment; working in coordination with or proximity to others without being unduly distracted; making simple work-related decisions; completing a normal workday and workweek without interruptions from psychologically-based symptoms; asking simple questions or requesting assistance; getting along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; dealing with normal work stress; being aware of hazards and taking appropriate precautions; carrying out detailed instructions; coping with the stress of semiskilled or skilled work; maintaining socially appropriate behavior; adhering to basic standards of neatness or cleanliness; and traveling in unfamiliar places.

Finally, Dr. Sadek indicated that Plaintiff experienced marked limitations with regard to activities of daily living; social functioning; and concentration, persistence, or pace and that Plaintiff experienced three periods of decomposition of at least two weeks duration over the previous twelve

months. In addition, Dr. Sadek indicated that Plaintiff suffered from a residual disease process that had resulted in such marginal adjustment that even a minimal increase in mental demands or change in environment was predicted to cause him to decompensate. Dr. Sadek opined that Plaintiff's mental impairment would have caused him to have missed three days of work each month. Dr. Sadek answered "No" to the question: "If your patient's impairments include alcohol or substance abuse, do alcohol or substance abuse contribute to any of your patient's limitations set forth above?" (AR 412).

### B. Hearing Testimony and Reports Submitted to the Administration

On May 5, 2009, Plaintiff indicated that he does not use alcohol or drugs and that he had been sober for five years. (AR 202).

On August 6, 2009, Plaintiff submitted an Adult Function Report in which he detailed that his impairments caused him to hear voices and see "spirits" running in front of him. (AR 223). Plaintiff left his residence only once each week as he preferred to keep to himself. He needed to be reminded to make his bed and to attend to personal hygiene. He wrote that he needed medication to be able to sleep at night. His days consisted of taking medication and watching television. He had difficulty maintaining concentration and paying attention. On that date, he indicated that he was living with friends in a house.

At the hearing on October 25, 2010, Plaintiff testified that he left his last job as a car washer because he heard voices and experienced visual hallucinations that precluded him from performing his duties. At the time of the hearing, Mr. Torres was hearing voices on a daily basis but was not hearing them at the hearing. Mr. Torres did not believe that he could complete a number of repeated, simple tasks over the course of an eight-hour day because of his disease. Mr. Torres testified that,

even though his prescribed medications that helped reduce auditory and visual hallucinations, the hallucinations did not stop completely. Mr. Torres testified that he resided in an assisted-living facility for the two years prior to the hearing. He had periodically lived in the facility in the past but was often forced to leave due to a lack of income. He returned to the facility after he felt that he could no longer "take it out in society" and interact with others. (AR 47). Mr. Torres did not like being around groups of people. He spent most of his time by himself in his room and only ventured out to the common room to watch television at night when no one else was around. When he was in his room, he spent time lying in bed. Mr. Torres treated with both a psychiatrist and a therapist while at Miller Beach Terrace.

Plaintiff testified that he had not used marijuana in more than 20 years and had not used alcohol since returning to the assisted-living facility.

Medical expert Dr. Kathleen O'Brien, Ph.D., testified that she was unable to read any of the notes provided by Plaintiff's psychiatrists as she could not read their handwriting. Dr. O'Brien was unable to develop a pattern from the evidence she reviewed. Dr. O'Brien believed that Plaintiff could have met the listing at 20 C.F.R. 404 Subpart P Appendix 1 § 12.03 if he had remained sober and lived in a sheltered-living facility since a certain date.

The ALJ did not pose any questions to the vocational expert.

## ANALYSIS

Plaintiff seeks reversal and remand for further proceedings, arguing that the ALJ (1) failed to explain how she evaluated the credibility of Plaintiff's allegations, did not consider the medications that Plaintiff was prescribed or the other measures he took to treat his impairments, and relied on meaningless boilerplate language; (2) improperly concluded that Plaintiff did not suffer

from restrictions with regard to social functioning; (3) did not account for Plaintiff's moderate limitations with regard to concentration, persistence, and pace in the RFC; and (4) improperly rejected the opinion of Plaintiff's treating physician Dr. Sadek. The Commissioner counters that the ALJ reasonably determined that Plaintiff was not disabled because the evidence demonstrated that, when Plaintiff stopped substance abuse, his impairments did not meet or medically equal a listed impairment and allowed him to perform work at all exertional levels for simple, routine tasks.

At the outset, remand is required because the ALJ ignored evidence when determining that Plaintiff continued to abuse alcohol and his residency status at the assisted living facility. It appears from the hearing testimony that the ALJ could not figure out when Plaintiff resided at Miller Beach Terrace. The Miller Beach Terrace medical treatment records show intakes in February 2009 and again in August 2009. If Plaintiff was removed in May 2009 for robbery, as it appears from the state agency employee's conversation with an employee at Miller Beach Terrace on May 29, 2009, the medical records at Miller Beach Terrace show a new "intake" on August 13, 2009. This is not inconsistent with the August 6, 2009 adult function report in which Plaintiff indicated that he was living with friends in a house. The ALJ mentions the August 6, 2009 report, but does not discuss the August 13, 2009 intake. Dr. O'Brien, the medical expert, noted the August 13, 2009 treatment note at the hearing. Both the physical and mental health treatment records from Miller Beach then include psychiatric treatment records for August 18, 2009, and September 22, 2009, medication updates in December 2009 and March 2010, and monthly psychiatric treatment notes from January 2010 through August 2010. In addition, Plaintiff's counsel wrote to the ALJ in November 2011, representing that Plaintiff continued to reside at Miller Beach Terrace. The ALJ does not mention this correspondence.

Moreover, there is no evidence in the record of any use of alcohol by Plaintiff after the May 29, 2009 comments by a representative of Miller Beach Terrace. Even if Plaintiff had been abusing alcohol prior to May 29, 2009, Plaintiff returned to Miller Beach Terrace in August 2009, and continued to live there at the time of the hearing in October 2010 and through at least November 2011. Miller Beach Terrace does not allow alcohol use, yet it appears that Plaintiff resided there for at least two years at the time of the ALJ's decision, and that he resided there for over one year prior to the hearing date. The ALJ does not discuss these facts in deciding that Plaintiff continued to abuse alcohol. (AR 16).

The ALJ is correct that the Plaintiff's representation in February 2009 that he had stopped using alcohol five years earlier appears inconsistent with Plaintiff's statement at the hearing in October 2010 that he had not been drinking for two years, and that Plaintiff's statement at the hearing that he had not been drinking for two years was inconsistent with the Miller Beach Terrace's employee's statements on May 29, 2009, that Plaintiff abused alcohol. But, the ALJ erred, in light of Plaintiff's ongoing residence at Miller Beach Terrace, by relying on the May 29, 2009 statement that Plaintiff abused alcohol prior to being discharged to impute continued alcohol use through October 2010 without further evidence.

In addition, none of the medical opinion evidence discusses alcohol abuse. The ALJ gave great weight to the opinion of Dr. Pressner, yet Dr. Pressner did not find that Plaintiff suffered from a substance addiction disorder. Neither did Dr. Sadek, who apparently has a speciality in substance abuse treatment. On the checklist of "signs and symptoms" on the Mental Impairment Questionnaire, one of the boxes is "substance dependence;" Dr. Sadek did not check that box. (AR 408). Dr. Sadek also answered "No" to the question: "If your patient's impairments include alcohol or substance

abuse, do alcohol or substance abuse contribute to any of your patient's limitations set forth above?" (AR 412). Neither Dr. Pressner nor Dr. Sadek opined that a substance addiction disorder affected Plaintiff's mental impairments. The ALJ takes this lack of analysis of alcohol use to mean that the doctors failed to consider or to incorporate the alcohol abuse in the opinion; but the ALJ does not consider the more likely possibility that these trained medical professionals did not discuss alcohol abuse because it was in fact *not* a factor in evaluating Plaintiff's mental limitations. Notably, Dr. Sadek began treating Plaintiff in January 2010, which was five months after Plaintiff was readmitted to Miller Beach Terrace, and eight months after the last report that he had been using alcohol. The timing supports Dr. Sadek's explicit conclusion that alcohol was not a factor.

The Court recognizes that the ALJ was faced with the difficult task of determining when and whether Plaintiff was abusing alcohol and of identifying Plaintiff's residency status at Miller Beach Terrace, an assisted living facility, given the limited and often illegible records, the evidence of record of alcohol abuse through May 2009, and Plaintiff's admission prior to May 2009 that he had used alcohol to compensate. However, the ALJ's omission of decipherable evidence demonstrating that Plaintiff lived at Miller Beach Terrace, which does not allow alcohol, from August 2009 through at least October 2010 if not November 2011, cannot be reconciled on its face with the ALJ's belief that Plaintiff continued to abuse alcohol after May 2009. And, the ALJ's belief that Plaintiff continued to abuse alcohol and the failure to acknowledge that Plaintiff returned to Miller Beach Terrace in August 2009 affected the ALJ's credibility determination, the RFC, and the weight given to the treating physician's opinion. Remand is required for the ALJ to reevaluate this underlying evidence and then redetermine credibility, the weight to the treating physician's testimony, and the RFC. The Court considers each of Plaintiff's arguments in turn.

## A. Credibility

Once the ALJ has found an impairment that reasonably could cause the symptoms alleged, the ALJ must consider the intensity and persistence of the symptoms. 20 C.F.R. §§ 404.1529(a), 416.929(a). The ALJ must consider a claimant's statements about symptoms and how the claimant's symptoms affect his daily life and ability to work. *Id*. Subjective allegations of disabling symptoms alone cannot support a finding of disability. *Id.* When determining disability, the ALJ must weigh these subjective complaints, the relevant objective medical evidence, and any other evidence of the following factors:

(1)     The individual's daily activities;
(2)     Location, duration, frequency, and intensity of pain or other symptoms;
(3)     Precipitating and aggravating factors;
(4)     Type, dosage, effectiveness, and side effects of any medication;
(5)     Treatment, other than medication, for relief of pain or other symptoms;
(6)     Other measures taken to relieve pain or other symptoms;
(7)     Other factors concerning functional limitations due to pain or other symptoms.

*See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). When evaluating the record as a whole, the ALJ considers any information provided by treating or examining physicians and other persons about the factors and how they affect the claimant. *See* SSR 96-7p, 1996 WL 374186 (Jul. 2, 1996); *see also* § 404.1529(c)(1). "Because the ALJ is in the best position to determine a witness's truthfulness and forthrightness . . . this court will not overturn an ALJ's credibility determination unless it is 'patently wrong.'" *Shideler v. Astrue*, 688 F.3d 306, 310-11 (7th Cir. 2012) (internal quotation marks omitted) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504-05 (7th Cir. 2004)); *see also Prochaska*, 454 F.3d at 738. Nevertheless, "an ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record." *Pepper v. Colvin*, 712 F.3d 351, 367 (7th Cir. 2013) (citing *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009)).

Plaintiff argues that remand is required because the ALJ used the oft-discussed boilerplate language to decide Plaintiff's credibility. *See, e.g.*, *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012). Notably, the ALJ's November 2011 decision was issued before the Seventh Circuit Court of Appeals first criticized the use of the boilerplate language in *Bjornson*. An ALJ's use of the boilerplate language does not amount to reversible error if she "otherwise points to information that justifies [her] credibility determination." *Pepper*, 712 F.3d at 367-68. In other words, the use of the template does not warrant remand when the ALJ gives other reasons, grounded in evidence, to explain her credibility determination. *See Filus v. Astrue* , 694 F.3d 863, 868 (7th Cir. 2012).

In this case, the ALJ's "boilerplate" language in the credibility determination within the RFC discussion provides: "the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment, for the reasons explained in detail above." (AR 21). Recently, the Seventh Circuit Court of Appeals has rekindled its criticism of the boilerplate language because the language's "implication . . . is that residual functional capacity (ability to engage in gainful employment) is determined *before* all the evidence relating to the claimed disability is assessed, whereas in truth all that evidence is material to determining the claimant's residual functional capacity." *Browning v. Colvin*, No. 13-3836, — F.3d — , —, 2014 WL 4370648, at *3 (7th Cir. Sept. 4, 2014); *see also Goins v. Colvin*, No. 13-3729, — F.3d —, —, 2014 WL 4073108, at *3 (7th Cir. Aug. 19, 2014).

In this case, remand is not warranted solely based on use of the boilerplate language because the ALJ analyzed Plaintiff's credibility and many of the factors in the context of the evidence of record. The format of the ALJ's decision is somewhat deceptive because there is very little

credibility discussion in the RFC section itself, where such a discussion is usually contained. Rather, most of the credibility discussion is contained in the step three analysis, (AR 15-16), in which the ALJ reviewed Plaintiff's allegations of impairments and found that "the claimant's allegations of disabling mental impairments in the absence of substance use are not credited fully due to numerous conflicts in the evidence" and that "[t]he record demonstrates that the claimant has either minimized and/or given inaccurate information regarding his history of substance abuse." (AR 15). The ALJ references this discussion in the boilerplate language with the phrase "for the reasons explained in detail above." (AR 21). It was not necessary for the ALJ to repeat the same analysis later in the RFC discussion. *See Rice v. Barnhart*, 384 F.3d 363, 379 n. 5 (7th Cir. 2004) (finding that, because an ALJ's decision is properly read as a whole, it would be a "needless formality" to require an ALJ to repeat the same factual analysis in multiple parts of the decision).

In that discussion "above," the ALJ considered Plaintiff's activities of daily living, incorporating statements by Plaintiff's son and from personnel at Miller Beach Terrace. The ALJ summarized Plaintiff's work history. The ALJ acknowledged Plaintiff's statements regarding seeing shadows and hearing voices as well as his history of schizophrenia and substance abuse. The ALJ found that the records contained little evidence of treatment for his mental impairments but that his "recent and remote history of substance abuse is well-documented." (AR 15). The ALJ discussed treatment notes from Miller Beach Terrace and listed Plaintiff's medications, his history of alcohol abuse (discussed in the opening of this Analysis section), his history of anti-social behavior, his past diagnosis of drug induced psychosis and substance abuse and his current diagnosis of paranoid schizophrenia, and the consultative examination of Dr. Walters. The ALJ then weighed the opinion evidence of the medical expert Dr. O'Brien, the state agency consultant Dr. Pressner, and treating

physician Dr. Sadek. Finally, the ALJ acknowledged Plaintiff's description of himself as a loner, that he stays to himself and does not trust others, and that he does not have friends. Thus, the Plaintiff is wrong when he contends that the ALJ did not conduct a credibility determination.

However, the ALJ's failure to discuss Plaintiff's ongoing residency at Miller Beach Terrace and no record of alcohol use since May 2009 brings into question the ALJ's credibility determination regarding Plaintiff's statements about his alcohol use and the ALJ's belief that Plaintiff's alcohol abuse was ongoing. Thus, the Court cannot say that the credibility determination is not patently wrong.

The ALJ's statement that the record contains little evidence of treatment for Plaintiff's mental impairments is irreconcilable with his ongoing treatment with medications for paranoid schizophrenia. Plaintiff was prescribed Trazodone, Fluphenazine, and Cogentin. Although the ALJ listed Plaintiff's medications and acknowledged that they were prescribed by his psychiatrist, the ALJ did not discuss the effect of Plaintiff's medications, either their efficacy or their side effects, on his credibility. Plaintiff testified that, although the medications provided some relief, he continued to experience auditory and visual hallucinations even while taking the medications. (AR 62-63). The Commissioner incorrectly accuses Plaintiff of ignoring his own testimony "that he did not currently hear *any* voices while taking his medications." (Def. Br., 17 (citing (AR 65)). Plaintiff's testimony in fact provides: "I still hear them every days[sic] and I still see the shadows that come flying by me but it's not as bad as, as like what it used to be when I was, you know, *out in society*. It was . . . and once I got, started taking my medication again I started, it started like

going away *some*." (AR 65) (emphasis added). Plaintiff testified that he was not hearing any voices at the hearing. He did not testify that he was not hearing any voices at all.[1]

The ALJ also found that Plaintiff's decision to reside in the structured environment at Miller Beach Terrace was primarily because of his alcohol use. Plaintiff testified that he lived at Miller Beach Terrace, an assisted-living facility, for a period of two years prior to the hearing. He testified that he had previously lived in the facility but had been forced to leave due to an inability to pay. He then returned when his Medicaid was restored and he felt that he was no longer able to "take it out in society." (AR 47). He received his medication at Miller Beach Terrace. After reevaluating the evidence to determine the status of Plaintiff's alcohol abuse and the dates he was living at Miller Beach Terrace, the ALJ is directed to reconsider the meaning of Plaintiff's residence at Miller Beach Terrace on his credibility.

## B. Step Three–Listing 12.03

At step three of the sequential analysis, the ALJ concluded that, if Plaintiff would have stopped using drugs or alcohol, his impairments would not meet or equal Listing 12.03. A claimant meets Listing 12.03 for schizophrenia if he has a "[c]urrent history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement." 20 C.F.R. § 404, Subpart P, App. 1, § 12.03(C)(3).

---

[1] The Commissioner argues that Plaintiff "alleged no medication side effects," citing his appeal function reports dated July 29, 2009, and October 29, 2009. On both reports, Plaintiff put a question mark under "side effects you have" for the medications Congentin and Fluconazole and "no" for side effects from Trazadone. (AR 207, 235). On the July 29, 2009 report, he listed no side effects from Prolixin, which was not listed on the October 29, 2009 report. Given his use of question marks, it is not at all clear that Plaintiff did not suffer side effects from all his medications. Moreover, despite the Commissioner's reference to them, the ALJ herself did not discuss these statements regarding side effects. And, even if Plaintiff did not suffer "side effects," the effectiveness of the medications in resolving his visual and auditory hallucinations is still in issue.

Plaintiff argues that the ALJ did not properly discuss the fact that Plaintiff lived in an assisted-living facility. The ALJ was aware that Plaintiff was living at Miller Beach Terrace and discussed that fact on several occasions. Dr. O'Brien, the medical expert, testified that as long as Plaintiff lived in that facility, he would meet Listing 12.03. (AR 69). In contrast, in a footnote, the ALJ noted that Dr. Pressner found that the evidence did not establish the need for a highly supportive living arrangement. (AR 16, n. 1). The ALJ does not discuss the conflict in this expert testimony. On remand, after having reevaluated the evidence regarding alcohol use, Plaintiff's ongoing residency at Miller Beach Terrace and the alcohol policy at Miller Beach Terrace, and Plaintiff's reason for living at Miller Beach Terrace, the ALJ shall reevaluate whether Plaintiff meets Listing 12.03(C). *See Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006) (remanding for a more thorough analysis at step three).

### C. Treating Physician

Plaintiff argues that the ALJ erred in weighing the opinion of treating psychiatrist Dr. Sadek. Dr. Sadek indicated in his opinion that Plaintiff suffered from chronic mental illness that was being managed with medication. As discussed in the background, Dr. Sadek gave opinions on all areas of mental functional limitations, including finding serious limitations in most areas needed to do unskilled work and marked limitations in restriction of activities of daily living, difficulties in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace.

An ALJ must give the medical opinion of a treating doctor controlling weight as long as the

> treating source's opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [a claimant's] case record . . . . When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this

> section in determining the weight to give the opinion. We will always give good reasons . . . for the weight we give to your treating source's opinion.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008); *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); SSR 96-8p, 1996 WL 374184 (Jul 2, 1996); SSR 96-2p, 1996 WL 374188 (Jul. 2, 1996). In other words, the ALJ must give a treating physician's opinion controlling weight if (1) the opinion is supported by "medically acceptable clinical and laboratory diagnostic techniques" and (2) it is "not inconsistent" with substantial evidence of record. *Schaaf*, 602 F.3d at 875.

The factors listed in paragraphs (c)(2)(i) through (c)(6) are the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability, consistency, specialization, and other factors such as the familiarity of a medical source with the case. 20 C.F.R. §§ 404.1527(c), 416.927(c). "[I]f the treating source's opinion passes muster under [§ 404.1527(c)(2)], then there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it." *Punzio v. Astrue*, 630 F.3d 704, 713 (7th Cir. 2011) (internal quotation marks omitted) (quoting *Hofslien*, 439 F.3d at 376). Courts have acknowledged that a treating physician is likely to develop a rapport with his or her patient and may be more likely to assist that patient in obtaining benefits. *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007). An ALJ is entitled to discount the medical opinion of a treating physician if it is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as the ALJ gives good reasons. *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010); *Schaaf*, 602 F.3d at 875; *Skarbek*, 390 F.3d at 503. The ALJ cannot pick and choose the evidence that favors her final decision; rather, the ALJ must articulate her analysis well enough for an appellate court to follow and review her reasoning. *Diaz*, 55 F.3d at 307.

The ALJ found Dr. Sadek's opinion to be less persuasive because it was submitted after the hearing. (AR 18). The ALJ also gave it little weigh because it was difficult to read, did not refer to Plaintiff's substance abuse, did not contain narrative explanations, and did not indicate when Dr. Sadek began treating Plaintiff. The Court finds none of these reasons persuasive.

First, under the checklist factors, Plaintiff argues that the ALJ did not discuss the length of treatment or weigh the monthly examinations by Dr. Sadek and did not give consideration to the fact that Dr. Sadek is a psychiatrist and that his specialty deals with addiction. The ALJ did mention that the treatment was monthly but failed to discuss why ten months of monthly treatment for medication management was insufficient or decreased the weight to be given to Dr. Sadek's opinion. The ALJ noted that the start of treatment could not be determined, yet the first treatment record from Dr. Sadek is dated January 5, 2010. (AR 403). It appears that the ALJ looked only at the opinion and not at the treatment notes. *See* (AR 18). The ALJ also did not discuss that Dr. Sadek was a psychiatrist. As to whether Dr. Sadek has a specialty in substance addiction, nothing in the record indicates that information was available at the hearing. Although an ALJ need not detail each factor on the checklist, the ALJ must properly consider the evidence of record. *See Henke v. Astrue*, 498 F. App'x 636, 640 n.3 (7th Cir. 2012) ("The ALJ did not explicitly weigh every factor while discussing her decision to reject Dr. Preciado's reports, but she did note the lack of medical evidence supporting Dr. Preciado's opinion, and its inconsistency with the rest of the record. This is enough.").

Second, the ALJ improperly gave less weight based on the fact that the opinion was submitted after the hearing. Timing is not a factor listed in 20 C.F.R. § 404.1527(c). "[T]hat a medical report is provided at the request of counsel . . . is not a legitimate basis for evaluating the

reliability of the report." *Chase v. Astrue*, 458 F. App'x 553, 557 (7th Cir. 2012) (quoting *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); citing *Punzio*, 630 F.3d at 712). This case differs slightly from *Chase*, in that the only reason given by the ALJ in *Chase* was the timing of the report. In this case, the ALJ gave other reasons for discrediting the report. However, the ALJ's other reasons for discounting Dr. Sadek's opinion do not suggest that Dr. Sadek was being unduly sympathetic to Plaintiff, and the other reasons are unsupported by the record evidence. Nothing in the report sets off the "alarm bells" that might ring when a solicited report is inconsistent with earlier evidence or based on a dearth of evidence. *See Masek v. Astrue*, No. 08C1277, 2010 WL 1050293, at *15 (N.D. Ill. Mar. 22, 2010) ("Alarm bells may rightly be thought to sound to the ALJ if a dire assessment of the claimant's ability to work follows on the heels of a fairly benign medical record."). Although a treating physician may potentially be biased, a proper examination of the factors under 20 C.F.R. 404.1527, and not the fact that the opinion was requested by counsel, is how an ALJ can determine the reliability of the opinion. *See Punzio*, 630 F.3d at 712-13.

Third, the fact that Dr. Sadek's treatment records and opinion were difficult to read is an issue that could have been corrected. Although Plaintiff carries the burden of submitting medical evidence establishing his impairments, the ALJ has a duty to ensure that the record is complete. The ALJ could have contacted Dr. Sadek for clarification of the treatment records. *See Barnett*, 381 F.3d at 669 ("An ALJ has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable." (citing 20 C.F.R. § 404.1527(c)(3); SSR 96-2p, at *4)). The Seventh Circuit Court of Appeals has said that "[a]n ALJ need recontact medical sources only when the evidence is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). In this case, the ALJ noted the sparse medical records.

And these records of Dr. Sadek's were central to evaluating both Plaintiff's mental illness and the weight given to Dr. Sadek's opinion. This is an instance in which recontacting the treating physician was warranted.[2]

Fourth, the ALJ's concern that Dr. Sadek did not provide narrative explanations for his opinions is misguided. In all but one place on the "Mental Impairment Questionnaire" where space or lines were provided for a narrative explanation, Dr. Sadek wrote comments and included clinical findings. Thus, his opinion is not conclusory or inadequately supported by clinical findings. *See Gildon v. Astrue*, 260 F. App'x 927, 929 (7th Cir. 2008).

Finally, as discussed above, the ALJ's reliance on Dr. Sadek's failure to discuss Plaintiff's purported alcohol use is misguided. Neither Dr. Sadek nor Dr. Pressner discussed alcohol abuse, and Dr. Sadek affirmatively found that alcohol abuse did not contribute to Plaintiff's limitations. (AR 412). The ALJ offers no support for her conclusion that Dr. Sadek must have failed to consider the purported alcohol use rather than the possibility that alcohol was not a factor based on Dr. Sadek's expert observations through Plaintiff's treatment with him while he resided at Miller Beach Terrace. The Commissioner supports this interpretation, writing, "The fact that Dr. Sadek's opinion does not reflect knowledge of Plaintiff's substance abuse history reasonably casts doubt on their treatment relationship." (Def. Br. 12-13). As noted above, Dr. Sadek began treating Plaintiff in January 2010, five months after Plaintiff was readmitted to Miller Beach Terrace, where alcohol was not permitted, and nine months after the last evidence of record in May 2009 that Plaintiff abused alcohol.

---

[2] The Commissioner cites *A.P.G. v. Colvin*, No. 1:12-CV-988, 2013 WL 4519652, at *5 (S.D. Ind. Aug. 26, 2013), for its holding that illegible doctors notes did not warrant updated examination because it is the claimant's burden to produce evidence of disability and the "submission of 'illegible' notes by claimant from her own [doctor] fails to satisfy that burden." *See* (Def. Br. 12) (quoting *A.P.G.*, 2013 WL 4519652). However, the court in *A.P.G.* cites no law in so holding.

Moreover, Dr. Sadek's opinion is consistent with Dr. O'Brien's testimony at the hearing that, if Plaintiff had been in a sheltered facility for a certain time period where he was unable to leave to consume alcohol, Plaintiff's impairment could have met Listing 12.03. Although there is no evidence that Plaintiff was *not* permitted to leave Miller Beach Terrace, Plaintiff testified that he did not leave.

On remand, the ALJ shall reweigh Dr. Sadek's opinion based on the permissible enumerated factors as well as the relevant evidence of record.

### D. Restrictions in Social Functioning

Plaintiff argues that the ALJ erred by failing to explain how she reached her conclusion that, if Plaintiff would have stopped using drugs and alcohol, he would have suffered only mild restrictions with regard to social functioning.

Dr. Pressner, a state agency reviewing psychologist, completed a Psychiatric Review Technique form and found that Plaintiff has moderate limitations in the ability to work in coordination with or in proximity to others without being distracted by them, the ability to interact appropriately with the public, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Social Security Ruling 96-6p requires an ALJ to consider the opinions given by state agency consultants and must explain the weight given to the opinions in the ALJ's decision. SSR 96-6p, 1996 WL 374180, at *2 (July 2, 1996).

Although the ALJ gave "considerable weight" to Dr. Pressner's opinion, (AR 21), the ALJ did not incorporate these social functioning limitations in the RFC and did not explain why she apparently rejected only this portion of Dr. Pressner's opinion. The failure to articulate any

justification for rejecting this opinion requires remand. *See Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (noting that the ALJ must "minimally articulate his or her justification for rejecting or accepting specific evidence of a disability"). At step three of the sequential analysis, the ALJ found that Plaintiff had "marked difficulties" in social functioning when using alcohol, discussing the evidence showing his history of anti-social behavior. Yet, in the RFC discussion, the ALJ changed course and found that Plaintiff's restrictions of social functioning were mild when not using alcohol.

In support of this finding, the ALJ discussed at length Plaintiff's interactions with his family. But the ALJ did not discuss Plaintiff's social interactions with others outside of his family, and Dr. Pressner's opinions addressed social interactions in the context of the workplace, not his family. Nor did the ALJ explain how Plaintiff, who suffered from auditory and visual hallucinations that caused him to end his most recent employment, could interact with others without limitation. As mentioned earlier, the ALJ also did not discuss that medication did not fully control Plaintiff's hallucinations.

The ALJ's distinction between moderate difficulties with social functioning when abusing alcohol and only mild difficulties when not abusing alcohol is impacted not only by the evidentiary problems regarding whether Plaintiff was in fact abusing alcohol but also by the fact that Dr. Pressner's opinion did not indicate that any of Plaintiff's limitations were the result of substance abuse.

Remand is required for a proper explanation of why the ALJ did not adopt Dr. Pressner's opinion regarding social functioning when she gave his opinion "considerable weight" and for a full discussion of the evidence regarding his limitations in social functioning. *See Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009) ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider 'all relevant evidence.'" (citing *Clifford*, 227 F.3d

at 871; *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Godbey v. Apfel*, 238 F.3d 803, 808 (7th Cir. 2000)).

### E. Concentration Persistence and Pace

Plaintiff argues that the ALJ erred by failing to include any limitations with regard to concentration, persistence, or pace in the RFC. At step three of the analysis, the ALJ concluded that, if Plaintiff ceased abusing drugs or alcohol, he would suffer from moderate restrictions with regard to concentration, persistence, or pace. (AR 20). The ALJ must address a claimant's limitations with regard to concentration, persistence, or pace when assessing the claimant's RFC. *See Stewart v. Astrue*, 561 F.3d 679, 685 (7th Cir. 2009); *Craft v. Astrue*, 539 F.3d 668, 677-78 (7th Cir. 2008).

Plaintiff argues that the restriction in the RFC to "simple, routine tasks" does not accommodate his moderate restrictions with regard to concentration, persistence, or pace. In this case, the ALJ properly relied on Dr. Pressner's opinion, to which the ALJ gave "considerable weight," that Plaintiff could perform simple, routine tasks. Like the ALJ, Dr. Pressner found that, for purposes of the step three analysis, Plaintiff had moderate difficulties with concentration, persistence, or pace. *See* (AR 311, 328). When Dr. Pressner then considered Plaintiff's mental RFC, he opined that Plaintiff could perform "SRT [simple, routine tasks] on a sustained basis without special considerations." (AR 317, 328). Thus, the ALJ incorporated Dr. Pressner's translation of Plaintiff's moderate functional limitations in concentration, persistence, and pace into the residual functional capacity for simple, routine tasks. *See Johansen v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002); *see also Milliken v. Astrue*, 397 F. App'x 218, 221-22 (7th Cir. 2010) (finding that the ALJ adequately accounted for the claimant's limitations in concentration, persistence, and pace by incorporating the expert's assessment that the claimant could perform unskilled work despite her

mental limitations); *Wynstra v. Astrue*, 2:11-CV-437, 2013 WL 550491, at *10-11 (N.D. Ind. Feb. 12, 2013); *Williams v. Astrue*, 1:11-CV-390, 2013 WL 228199, at *6-7 (N.D. Ind. Jan. 22, 2013). Remand is not required on this issue.

## F. Award of Benefits

Plaintiff asks the Court to find that Dr. Sadek's opinion is entitled to significant weight and enter an order awarding Plaintiff disability benefits based on Dr. Sadek's opinion that Plaintiff would experience marked and serious limitations that would preclude him from sustaining competitive employment. An award of benefits is appropriate "only if all factual issues involved in the entitlement determination have been resolved and the resulting record supports only one conclusion—that the applicant qualifies for disability benefits." *Allord v. Astrue*, 631 F.3d 411, 415 (7th Cir. 2011) (citing *Briscoe*, 425 F.3d at 356)). This is not one of those rare situations. The unresolved issues can only be resolved through further proceedings on remand. Accordingly, this matter is remanded for further proceedings.

## CONCLUSION

Based on the foregoing, the Court hereby **GRANTS** the relief sought in Plaintiff's Brief in Support of His Motion to Reverse the Decision of the Commissioner of Social Security [DE 16], **REVERSES** the final decision of the Commissioner of Social Security, and **REMANDS** this matter for further proceedings consistent with this Opinion and Order.

So ORDERED this 15th day of September, 2014.

s/ Paul R. Cherry                                    
MAGISTRATE JUDGE PAUL R. CHERRY
UNITED STATES DISTRICT COURT

cc:     All counsel of record